## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MICAELA CRUZ on her own behalf and on behalf of her minor child, A.C., and DONTAY CRUZ, on his own behalf,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO; CHICAGO POLICE OFFICERS DAVID SALGADO, XAVIER ELIZONDO, JOSEPH TREACY, ROBERTO RAMIREZ, RICHARD MOSTOWSKI, MICHAEL KARCZEWSKI, DANIEL PACELLI, DAVID PARDO, CARLOS NUNEZ, EDWIN UTRERAS, JA MCCLAIN, MJ HERNANDEZ,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Micaela Cruz ("Ms. Cruz"), on behalf of herself and her minor child, A.C., and Dontay Cruz ("Mr. Cruz"), by their attorneys, Loevy & Loevy, complain of Defendants City of Chicago, Chicago Police Department Officers Salgado, Elizondo, Treacy, Ramirez, Mostowski, Karczewski, Pacelli, Pardo, Nunez, Utreras, McClain, Hernandez, and Unknown Officers, as follows:

## INTRODUCTION

1. Plaintiff Micaela Cruz was twice arrested for narcotics crimes she did not commit.

2. Defendants twice fabricated evidence against Ms. Cruz to obtain bogus search warrants that they utilized to unlawfully search the Plaintiffs' home, detain the

Plaintiffs at gunpoint, threaten the Plaintiffs, and falsely accuse Ms. Cruz of crimes while terrorizing her children.

3. In both instances, Defendant Officers falsely arrested Ms. Cruz, claiming to recover drugs during a search that Defendants did not, in fact, recover during the search.

4. Ms. Cruz's first false arrest was one of many that Defendants Elizondo and Salgado manufactured against innocent citizens.

5. Defendants Elizondo and Salgado have now been federally convicted of crimes related to their false and fabricated search warrants that resulted in false arrests. *See United States v. Elizondo and Salgado* (N.D. Ill. 18 CR 286).

6. In both instances, all charges against Ms. Cruz were dismissed.

7. Plaintiffs bring this suit to seek redress for the wrongs committed against them.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Plaintiffs' rights secured by the U.S. Constitution.

9. This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper under 28 U.S.C. § 1391(b). Plaintiffs reside in this judicial district, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiffs' claims occurred within this judicial district.

2

## PARTIES

11. Plaintiff Micaela Cruz is a resident of Cook County, Illinois, where she was falsely accused of crimes she did not commit. She is the mother of Plaintiff Dontay Cruz. She is also the mother of her minor child, A.C., on whose behalf she also sues. The Plaintiffs were residents of Cook County, Illinois at the time the incidents at issue took place.

12. Defendant City of Chicago is an Illinois municipal corporation and is and/or was the employer of each of the Defendant Officers. The City of Chicago is liable for the acts of the Defendant Officers while acting within the scope of their employment for the City. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department

13. At all times relevant hereto, Defendants Salgado, Elizondo, Treacy, Ramirez, Mostowski, Karczewski, Pacelli, Pardo, Nunez, Utreras, McClain, Hernandez, and other unknown law enforcement officers (collectively, the "Defendant Officers") were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

## FACTS

### The January 2018 Arrest

14. Defendants Salgado, Elizondo, Treacy, Ramirez, Mostowski, Karczewski, Pacelli, Pardo, Nunez and other Unknown Officers ("2018 Defendant Officers") fabricated evidence and obtained a search warrant to allow them to search

Plaintiffs' home in January 2018. They had no legal basis on which to search Plaintiffs' home.

15. In January 2018, the 2018 Defendant Officers burst into Plaintiffs' home armed with the bogus warrant.

16. Ms. Cruz was not home but Mr. Cruz (age 16 at time) was at home with his younger siblings A.C. (age 12), A.J. (age 6), and B.J. (age 4).

17. Mr. Cruz was in bed and was awoken when a flashlight was shined in his eyes and guns pointed at his head.

18. As he opened his eyes, Mr. Cruz saw several of the 2018 Defendant Officers, in masks, about an arms-length away from him pointing guns toward his head. The Defendant Officers did not identify themselves as police officers, and Mr. Cruz did not immediately understand that the Defendant Officers were police officers.

19. Some of the 2018 Defendant Officers then grabbed Mr. Cruz out of bed and immediately handcuffed him.

20. Some of the 2018 Defendant Officers than instructed Mr. Cruz to call his mother, Ms. Cruz, and tell her to come home.

21. Some of the 2018 Defendant Officers instructed Mr. Cruz not to alert Ms. Cruz that officers were in her home when he called her.

22. At the 2018 Defendant Officers' insistence, Mr. Cruz called his mother, Ms. Cruz, on his cell phone in the presence of some of the 2018 Defendant Officers, but he did alert her that officers were present.

4

23. The 2018 Defendant Officers became upset; one officer got on the phone and told Ms. Cruz that if she did not come home immediately they would (falsely) arrest Mr. Cruz, who at the time was a minor; officers also ransacked the apartment, damaging fixtures and other property in the apartment, and they held at least Mr. Cruz and A.C. at gunpoint.

24. When Ms. Cruz arrived home, the apartment was in disarray.

25. Shortly thereafter, the 2018 Defendant Officers claimed that they found heroin in Ms. Cruz's bedroom. That statement was a total fabrication.

26. On the basis of these fabrications, 2018 Defendant Officers arrested Ms. Cruz.

27. The 2018 Defendant Officers also stole $800 from Plaintiffs' apartment which Ms. Cruz needed to pay her rent.

28. The 2018 Defendant Officers conspired to create false and fabricated police reports.

29. As a result of the 2018 Defendant Officers' misconduct, Ms. Cruz was wrongfully detained and faced criminal charges.

30. The charges for the January 2018 arrest were dismissed in March 2018.

### The January 2019 Arrest

31. In January 2019, Plaintiffs' home was raided again.

32. Once again, Chicago police officers relied on a false and fabricated search warrant to enter Ms. Cruz's home.

33. Ms. Cruz was home with her boyfriend at the time when Defendant Officers Utreras, McClain, Hernandez, and other unknown Officers ("2019 Defendant Officers") relied on a bogus search warrant to burst into her home.

34. Some of the 2019 Defendant Officers were masked and pointed guns at Ms. Cruz without justification.

35. The 2019 Defendant Officers again ransacked Ms. Cruz's home, damaging fixtures and property therein.

36. The 2019 Defendant Officers again fabricated a case against Ms. Cruz for illegal drugs she did not have.

37. On the basis of this fabrication, the 2019 Defendant Officers arrested Ms. Cruz.

38. The 2019 Defendant Officers conspired to create false and fabricated police reports.

39. As a result of the 2019 Defendant Officers' misconduct, Ms. Cruz was wrongfully detained and faced criminal charges.

40. The charges for the January 2019 arrest were later dismissed.

41. On information and belief, this January 2019 arrest was in retaliation for Ms. Cruz's efforts to expose Defendants Salgado and Elizondo's misdeeds.

**Defendants Salgado and Elizondo Are Arrested and Convicted**

42. Shortly after the January 2018 arrest, Defendants Elizondo and Salgado were taken off street duty because of allegations that they falsified search warrants, along with other misconduct.

6

43. On May 10, 2018, Defendants Elizondo and Salgado were arrested and charged via federal indictment in the Northern District of Illinois. The superseding indictment charged conspiracy to commit theft, embezzlement, obstruction of justice, false statements to law enforcement, and conspiracy to deprive residents of Chicago of the right to be free from unreasonable searches pursuant to a warrant knowingly obtained through false and fabricated information.

44. In addition, the indictment alleged that Defendant Elizondo and Salgado submitted materially false search warrant applications and induced informants to provide false information to Cook County judges to fraudulently obtain warrants so Defendant Officers could seize and steal items from Chicago residents.

45. On October 22, 2019, Defendants Elizondo and Salgado were convicted on all counts.

**Policy and Practice of Impunity**

46. At all times relevant to Plaintiffs' claims, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Officers used excessive force, fabricated evidence, and/or arrested an individual without probable cause. Prior to and during the period in which Plaintiffs suffered excessive force, false arrest, and wrongful prosecution, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional

rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

47. The United States Department of Justice recently issued a report discussing the deficiencies within the Chicago Police Department. On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

48. The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious

investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

49. Similarly, the Chicago Police Accountability Task Force ("PTAF") reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

50. Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

51. Between 2011 and 2015, nearly half of complaints filed against Chicago Police officers were not even investigated.

52. More than 95% of complaints against the Chicago Police are found to be unsustained.

53. Less than 2% of complaints against the Chicago Police resulted in any discipline.

54. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

55. The failure of police supervision and discipline in the City of Chicago during the relevant time period is a fact admitted by City policymakers and Chicago Police officers.

56. Former Mayor of the City of Chicago Rahm Emanuel has acknowledged that a "code of silence" exists within the Chicago Police Department.

57. In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

58. In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

59. Recently, Mayor Lori Lightfoot urged federal prosecutors to examine the trial of Chicago Police officers accused of covering up the Laquan McDonald shooting, saying "[w]e've got to have transparency and healing."

60. The code of silence in the Chicago Police Department has been longstanding.

61. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police maintained a code of silence that facilitated police misconduct.

62. In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

63. The same code of silence and ineffective system of police oversight were in place when Plaintiffs' constitutional rights were violated in 2018 and again in 2019.

64. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated

10

in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

65. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens. This includes Defendants in this case.

### Policy and Practice of Fabricating Evidence

66. The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Plaintiffs.

67. Since 1986, well over 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the arrests and subsequent convictions of innocent person for serious crimes that they did not commit. This number does not even take into account the scores of false arrests that did not result in conviction.

68. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false.

11

69. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, fabricated reports, witness identifications, and other evidence, which was used to wrongfully prosecute Plaintiff.

70. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

71. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Policy and Practice of Using Excessive Force, Particularly Against Minors**

72. Chicago police officers have a *de facto* policy, widespread custom of using unnecessarily or excessive force against citizens of color, including infants, children, youth and their close relatives, leading to untold trauma to young people.

73. The 2017 United States Department of Justice investigation of the CPD concluded, among other things, that CPD has a pattern and practice of using excessive force against citizens, including children.

12

74. The 2016 report of the mayoral-appointed PATF contained substantially similar conclusions and recommended a number of specific police reforms to improve police interactions with and in the presence of youth.

75. None of the reforms or new officer training that CPD has implemented or announced to date purport to remedy or address Chicago police officers' use of excessive force against or in the presence of infants, children, and youth.

76. CPD's recently revised use of force policy, GO3-02, does not expressly require officers to avoid using force against or in the presence infants, children, youth and their close relatives when possible and does not require officers to use a trauma-informed approach to the use of force to situations where children are present and some police force is necessary. CPD's search warrant policy, SO9-14, was also not revised to incorporate these or any similar changes.

77. Unlike other major U.S. metropolitan police departments – such as Cleveland, Indianapolis, Charlotte, Baltimore, San Francisco and many others – CPD still does not provide any training or supervision to officers concerning youth brain development or the importance of preventing trauma to infants, children and youth by utilizing a trauma-informed approach to the use-of-force in situations where they are present.

78. The connection between trauma and youth development and between trauma and mental and physical health is now well-established. Exposure to trauma stunts child development in multiple ways.

79. It is also well-known that many poor children of color have already been subjected to multiple traumas in the neighborhoods and circumstances in which they live and, therefore, that police use of unnecessary force against them or in their presence compounds already profoundly traumatic life experiences.

80. Defendant Officers' use of excessive force against Plaintiffs was directly and proximately caused by long-standing, interrelated failures of official policy, lack of official policy, and *de facto* policies, widespread practices, and/or customs of the City of Chicago, including (A) a pattern and practice of using unnecessary or excessive force against citizens, including infants, children, and youth; (B) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against citizens, including infants, children, and youth and/or their close relatives in the minors' presence; and (C) an absence of official policy and training to avoid unnecessary or excessive force against or in the presence of infants, children, or youth.

81. Defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force against citizens, including infants, children and youth.

82. The City was on notice of each of these failures of official policy from, among other things, the specific conclusions reached by and the data contained in the 2017 United States Department of Justice investigative and the PATF reports.

14

83. Defendant Officers' conduct toward and in the presence of Plaintiffs was undertaken as a direct consequence of Defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to avoid using unnecessary or excessive force against or in the presence of infants, children or youth whenever possible.

84. Even after the findings of the U. S. Department of Justice investigation and the Mayor's PATF were known to City policy makers, the City failed to implement or announce implementation of any reforms that purported to remedy the pattern and practice of excessive use of force against or in the presence of infants, children, and youth – a failure which amounted to a deliberate choice not to take action to prevent the violation of plaintiffs' constitutional rights. City and CPD's failure to implement these explicit policies, reforms and priorities was a cause of the injuries to Ms. Cruz and her family. Specifically, this lack of official policies, training, and reforms includes, without limitation:

    i. The continued absence of any provision in CPD's official use of force policy that would explicitly guide or require officers to avoid using force against or in the presence of infants, children, and youth or to use a trauma-informed approach to the use of force in situations where minors are present and some force may necessary;

    ii. CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit guidance or requirement that officers should avoid using force

against or in the presence of infants, children, and youth or to use a trauma-informed approach to the use of force in situations where minors are present and some force may be necessary;

iii.  CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (i) whether minors reside in the residence, (ii) to avoid entry and search at times when minors are likely to be present (iii) to plan manner of entry and force tactics based on whether minors are expected to be present; (iv) to de-escalate themselves or change tactics when they unexpectedly encounter infants, children, or youth, and/or (v) to take other precautions to avoid traumatizing minors and their close relatives, such as avoiding pointing guns at or placing parents and caretakers in handcuffs in the children's presence;

iv.  CPD's refusal to utilize, both before and since the U. S. Department of Justice and PATF reports were released, national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children and/or offered model use-of-force policies that included explicit provision for avoiding the unnecessary use of force against and in the presence of children; and

v.  The City's and CPD's refusal or failure to propose or agree to any explicit protections for children from excessive force or any provisions requiring a

16

trauma- informed approach to policing children in the federal consent decree it negotiated with the State of Illinois.

85. The City's lack of official policies to protect children and others from unnecessary officer use of force, combined with its failure to hold accountable officers who use unnecessary force involving minors, have resulted in a *de facto* City policy and practice of using unreasonable force against or in the presence of infants, young children, youth and their families, as concluded by the U. S. Department of Justice investigation into the Chicago Police Department and the PATF. The excessive force used against Plaintiffs was an example of and result of this *de facto* policy.

86. Through their combined failures, before and after notice, to enact official policies that protect infants and children from unnecessary force and to hold accountable officers who use excessive force against them or in their presence, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA"), the Civilian Office of Police Accountability ("COPA") or the City of Chicago Inspector General ("IG"). These past failures directly authorized, encouraged and emboldened Defendant Officers' conduct against and in the presence of Plaintiffs, providing them a general license to use excessive force involving minors whenever it suits them.

87. Through their combined failures, before and after notice, to enact official policies protecting children from unnecessary force and to hold accountable officers who use excessive force against or in the presence of infants and other minors, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the IG, the Mayor, and the Chicago City Council – condoned, approved, facilitated, encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of infants, children, and youth.

88. Finally, during all times relevant to the incident involving Plaintiffs, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against infants, children, youth and/or their close relatives in the minor's presence. Defendant Officers' conduct toward Ms. Cruz and her children, including their failure to intervene and failure to report the actions of their colleagues, was the direct result of the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

89. By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of unnecessary force against or in the presence of infants, children, and youth, defendant City of Chicago has manifested and

manifests deliberate indifference to the deprivation of Ms. Cruz's and her family's constitutional rights.

90. These polices, practices and customs collectively, directly and proximately caused the violations of Plaintiffs' constitutional rights set forth above and below and the resulting injuries, such that the City of Chicago is liable for its officers' use of excessive force.

**Plaintiffs' Damages**

91. Ms. Cruz suffered pain, suffering, mental anguish, anxiety, fear, humiliation, embarrassment, despair, rage, and other effects as a result of Defendants' misconduct.

92. Mr. Cruz and Minor Plaintiff A.C. were in fear for their lives and continue to suffer untold damage and ill-effects from the 2018 Defendant Officers' decision to terrorize the kids while falsely arresting their mom.

93. As a result of the foregoing, Plaintiffs have suffered substantial damages proximately caused by Defendants' wrongdoing.

**Count I: 42 U.S.C. § 1983 – Excessive Force, Fourth Amendment**
**(on behalf of all Plaintiffs)**

94. Plaintiffs incorporate each paragraph of this complaint as if fully restated here.

95. In the manner described more fully above, the 2018 Defendant Officers violated Plaintiffs' Fourth Amendment right to be free from unreasonable force when they needlessly terrorized the minor Plaintiffs by *inter alia*, pointing guns at them and by handcuffing Mr. Cruz, all without justification, and the 2019

19

Defendant Officers violated Plaintiff Micaela Cruz's Fourth Amendment right to be free from unreasonable force when they needlessly and without justification pointed guns at her during the bogus search of her apartment.

96. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered serious injury, great mental anguish, humiliation, degradation, pain and suffering, and other grievous and continuing injuries and damages as set forth above.

97. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described herein.

## Count II: 42 U.S.C. § 1983 – Due Process
## (on behalf of Plaintiff Micaela Cruz)

98. Each paragraph of this Complaint is incorporated as if restated fully herein.

99. In the manner described more fully above, Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, deprived Plaintiff of her constitutional right to due process.

100. In the manner described more fully above, Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, as well as knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

101. Defendants' misconduct directly resulted in the detention of Plaintiff and in the start of and continuation of unjust criminal proceeding against Plaintiff,

denying her of her constitutional right to due process under the Fourteenth Amendment. Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued.

102.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

103.   Defendants' actions were taken under color of law and within the scope of their employment.

104.   The City of Chicago is also directly liable for the injuries described in this Count because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights, as described more fully above.

105.   Plaintiff's injuries were caused by CPD officers, agents, and employees of Defendant City of Chicago, including, but not limited to, the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## Count III: 42 U.S.C. § 1983 – Fourth Amendment Claim
## (on behalf of Plaintiff Micaela Cruz)

106.   Each paragraph of this Complaint is incorporated as if restated fully herein.

107.   In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and

perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

108.   In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of her liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

109.   The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

110.   Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend herself during those proceedings, resulting in a deprivation of her liberty.

111.   In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which she was totally innocent. This was accomplished through Defendants' fabrication and suppression of evidence.

112.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth and of Plaintiff's clear innocence.

113.   The Defendants' actions were taken under color of law and within the scope of their employment.

114.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, pain and

suffering, and other grievous and continuing injuries and damages as set forth above.

115. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count IV: 42 U.S.C. § 1983 – Failure to Intervene
## (on behalf of all Plaintiffs)

116. Each paragraph of this Complaint is incorporated as if restated fully herein.

117. In the manner described more fully above, during the constitutional violations described herein, Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so.

118. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth.

119. The Defendants' actions were taken under color of law and within the scope of their employment.

120. As a result of Defendants' misconduct described in this Count, Plaintiff Micaela Cruz suffered loss of liberty, and all Plaintiffs suffered great mental anguish, humiliation, degradation, pain and suffering, and other grievous and continuing injuries and damages as set forth above.

121.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count V: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights (on behalf of all Plaintiffs)

122.    Each paragraph of this Complaint is incorporated as if restated fully herein.

123.    Prior to the wrongful acts alleged herein, the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves deprive Plaintiffs of their constitutional rights, all as described above.

124.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiffs of their rights.

125.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

126.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth.

127.    The Defendants' actions were taken under color of law and within the scope of their employment.

128.   As a result of Defendants' misconduct described in this Count, Plaintiff Micaela Cruz suffered loss of liberty, and all Plaintiffs suffered great mental anguish, humiliation, degradation, pain and suffering, and other grievous and continuing injuries and damages as set forth above.

129.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

## Count VI: Illinois Law – Malicious Prosecution
### (on behalf of Plaintiff Micaela Cruz)

130.   Each paragraph of this Complaint is incorporated as if restated fully herein.

131.   In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

132.   In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

133.   The Defendants' actions were taken under color of law and within the scope of their employment.

134.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, pain and

suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VII: Illinois Law – Intentional Infliction of Emotional Distress
## (on behalf of all Plaintiffs)

135.    Each paragraph of this Complaint is incorporated as if restated fully herein.

136.    The actions, omissions, and conduct of Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs, as is more fully alleged above.

137.    The Defendants' actions were taken under color of law and within the scope of their employment.

138.    As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count VIII: Illinois Law – Civil Conspiracy
## (on behalf of all Plaintiffs)

139.    Each paragraph of this Complaint is incorporated as if restated fully herein.

140.    As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to deprive Plaintiffs of their rights and conspired by concerted

26

action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiffs of their rights.

141. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

142. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and with total disregard of the truth.

143. As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count IX: 42 U.S.C. § 1983 – First Amendment
### (on behalf of Plaintiff Micaela Cruz)

144. Each paragraph of this Complaint is incorporated as if restated fully herein.

145. On information and belief, in the manner described more fully above, Defendant Officers violated Plaintiff's rights as secured by the First Amendment of the U.S. Constitution. Plaintiff's complaints about the Defendant Officers' misconduct constituted protected speech and expression under the First Amendment. Plaintiff's complaints were also protected under the Petition Clause of the First Amendment: Plaintiff was petitioning the government for redress of grievances.

146. In the manner described more fully above, Defendant Officers' actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in protected activity.

147. Plaintiff's protected First Amendment activity was at least a motivating factor in 2019 Defendant Officers' decision to take retaliatory action. The Defendant Officers would not have pinned a second false case on Ms. Cruz in the absence of Plaintiff's protected First Amendment activity.

148. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's clear innocence.

149. The Defendants' actions were taken under color of law and within the scope of their employment.

150. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count X: Illinois Law – *Respondeat Superior*

151. Each paragraph of this Complaint is incorporated as if restated fully herein.

152. While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

28

153.    Defendant City of Chicago is liable as principal for all torts committed by their agents.

## Count XI: Illinois Law – Indemnification

154.    Each paragraph of this Complaint is incorporated as if restated fully herein.

155.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

156.    Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs Micaela Cruz, on behalf of herself and her minor child, A.C., and Plaintiff Dontay Cruz, respectfully request that this Court enter a judgment in their favor and against the City of Chicago, Defendant Officers, and other as-yet-unidentified officers of the Chicago Police Department, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

Respectfully submitted,


/s/ Scott Rauscher
*One of Plaintiffs' Attorneys*

Jon Loevy
Arthur Loevy
Scott Rauscher
Joshua Tepfer
Theresa Kleinhaus
Sean Starr
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Phone: (312) 243-5900