# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MICAELA CRUZ, individually, and | ) | |
| on behalf of her minor child, A.C., and | ) | |
| DONTAY CRUZ, individually, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20-cv-250 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is about not one, but two searches of the home of Plaintiff Micaela Cruz by officers from the Chicago Police Department. Micaela Cruz and two of her children claim that the police entered their home based on "bogus" search warrants backed by phony evidence. Once inside, the police allegedly pointed guns at the occupants, ransacked the place, and swiped what they wanted. When it was all said and done, Micaela Cruz was charged with a crime – twice – but the charges were later dismissed.

The first search happened in 2018, and the second took place in 2019. Plaintiffs responded by bringing claims against a collection of officers, as well as the City of Chicago. Two of the officers (David Salgado and Xavier Elizondo) were indicted and convicted in this District for engaging in substantially the same conduct.

Defendants moved to dismiss the eleven-count complaint. For the reasons stated below, the motions to dismiss are granted in part and denied in part.

**Background**

At the motion-to-dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

**The 2018 Search and Arrest**

In January 2018, a group of officers from the Chicago Police Department entered the apartment of Plaintiff Micaela Cruz. *See* Cplt., at ¶¶ 14–15 (Dckt. No. 1). The group included Defendants Salgado, Elizondo, Treacy, Ramirez, Mostowski, Karczewski, Pacelli, Pardo, and Nunez, plus other unknown officers (the "2018 Defendant Officers"). *Id.* They arrived, the complaint says, with a "bogus" search warrant based on "fabricated evidence." *Id.* at ¶¶ 2, 14–15.

Micaela Cruz was not home, but her four children were there, including Plaintiff Dontay Cruz (age 16 at the time), Plaintiff A.C. (age 12), A.J. (age 6), and B.J. (age 4). *Id.* at ¶ 16. The complaint does not allege the time of day, but the oldest child was sleeping and received a rude awakening. *Id.* at ¶ 17. Dontay Cruz "was in bed and was awoken when a flashlight was shined in his eyes." *Id.* He woke up to see "guns pointed at his head." *Id.*

The officers wore masks, and "did not identify themselves as police officers." *Id.* at ¶ 18. So the teenager didn't immediately understand that the masked, gun-toting, unexpected visitors were law enforcement. *Id.* A few of the officers then grabbed him from his bed and put him in handcuffs. *Id.* at ¶ 19.

The officers told Dontay Cruz to call his mother (again, Plaintiff Micaela Cruz) to tell her to come home. *Id.* at ¶ 20. At some point, the officers must have revealed that they were with the Chicago Police Department, because they told the teenager "not to alert Ms. Cruz that officers were in her home when he called her." *Id.* at ¶ 21.

It is unclear if Dontay Cruz was still handcuffed, but he was able to place a call to his mother. *Id.* at ¶ 22. He reached his mom and told her that she needed to come home. *Id.* He divulged the reason, too – the police were there – even though the officers told him not to. *Id.*

That revelation did not go over well with the officers, who "became upset." *Id.* at ¶ 23. An officer took the phone and told Micaela Cruz that she needed to come home immediately, or else. *Id.* He threatened to arrest Dontay Cruz if she didn't get right home. *Id.*

The officers held Dontay Cruz and his younger sibling (A.C.) at gunpoint. *Id.* The officers then "ransacked the apartment, damaging fixtures and other property." *Id.* The officers also took $800 from the apartment, which Micaela Cruz needed to pay rent. *Id.* at ¶ 27.

When Micaela Cruz got home, she found the apartment in disarray. *Id.* at ¶ 24. The officers then claimed that they had found heroin in her bedroom. *Id.* at ¶ 25. "That statement was a total fabrication." *Id.*

The police placed her under arrest. *Id.* at ¶ 26. The whole thing, Plaintiffs allege, was based on falsehoods. "The 2018 Defendant Officers conspired to create false and fabricated police reports," and as a result, Micaela Cruz "was wrongfully detained and faced criminal charges." *Id.* at ¶¶ 28–29. But the charges didn't last. The charges were dropped about two months later, in March 2018. *Id.* at ¶ 30.

**Defendants Salgado and Elizondo**

Soon after the January 2018 arrest, officers Salgado and Elizondo were removed from street duty because of allegations of misconduct, including falsifying search warrants.  *Id.* at ¶ 42.  They were part of the group that entered Plaintiffs' home in January 2018.  *Id.* at ¶ 14.

In May 2018, Salgado and Elizondo were indicted in the Northern District of Illinois.  *Id.* at ¶ 43; *see generally United States v. Elizondo*, No. 18-cr-286.  The superseding indictment included seven counts, accusing them of conspiring to "embezzle, steal, obtain by fraud, and otherwise without lawful authority knowingly convert" other people's property.  *See* Superseding Indictment, at ¶ 2, *United States v. Elizondo*, No. 18-cr-286 (Dckt. No. 39).  The conspiracy included submitting materially false applications for search warrants, and then entering homes and stealing property.  *Id.* at ¶ 4.  In October 2019, Salgado and Elizondo were convicted on all counts.  *See* Jury Verdicts, *United States v. Elizondo*, No. 18-cr-286 (Dckt. Nos. 137, 138).

**The 2019 Search and Arrest**

After the indictment, but before the conviction, the Chicago Police Department searched the home of Micaela Cruz a second time.

In January 2019, a year after the first search, a different group of officers – Defendants Utreras, McClain, and Hernandez, plus unknown officers (the "2019 Defendant Officers") – executed a search warrant at Plaintiffs' home.  *See* Cplt., at ¶¶ 31–32 (Dckt. No. 1).  The group was different, but the gist was the same.  The Chicago Police Department entered the home armed with a warrant based on "false and fabricated" evidence.  *Id.* at ¶ 32.

This time, Micaela Cruz was home with her boyfriend when the police entered.  *Id.* at ¶ 33.  Some of the officers "were masked and pointed guns at Ms. Cruz without justification."

*Id.* at ¶ 34.  Once again, the officers ransacked the home and damaged fixtures and property.  *Id.* at ¶ 35.

For a second time, officers "fabricated a case against Ms. Cruz for illegal drugs she did not have."  *Id.* at ¶ 36.  The officers placed her under arrest and created false police reports.  *Id.* at ¶¶ 37–38.  She "was wrongfully detained and faced criminal charges" once again.  *Id.* at ¶ 39.

The charges, like the charges from the first search, were later dropped.  *Id.* at ¶ 40.  Micaela Cruz claims that the January 2019 arrest "was in retaliation for Ms. Cruz's efforts to expose Defendants Salgado and Elizondo's misdeeds."  *Id.* at ¶ 41.

**This Lawsuit**

Plaintiffs ultimately filed suit against the City of Chicago, the 2018 Defendant Officers, and the 2019 Defendant Officers.  *Id.* at ¶¶ 12–13.  The complaint includes eleven counts, including six counts under federal law (Counts I to V, IX) and five counts under state law (Counts VI to VIII, X, XI).

Count I is an excessive force claim.  Plaintiffs Dontay Cruz and A.C. allege that the 2018 Defendant Officers used excessive force by unnecessarily pointing guns at them and handcuffing Dontay Cruz.  *Id.* at ¶ 95.  Micaela Cruz also claims that the 2019 Defendant Officers used excessive force during the latter search by pointing guns at her.  *Id.*  (Micaela Cruz does not appear to bring a claim on her own behalf based on the 2018 search, presumably because she wasn't there.)

Micaela Cruz is the only plaintiff for Counts II & III.  Count II is a due process claim.  She alleges that the "Defendant Officers" (presumably all of them) withheld exculpatory evidence and fabricated evidence in violation of the Fourteenth Amendment.  *Id.* at ¶¶ 99–101.

Count III is a claim for unlawful seizure. Micaela Cruz alleges that she was unreasonably seized without probable cause in violation of the Fourth Amendment.[1] *Id.* at ¶¶ 107–108.

All three Plaintiffs (meaning Micaela Cruz, Dontay Cruz, and A.C.) bring Counts IV and V. Count IV is a failure-to-intervene claim. Plaintiffs allege that the officers stood by and failed to prevent other officers from violating their rights. *Id.* at ¶ 117. Count V is a conspiracy claim about the deprivation of their constitutional rights. *Id.* at ¶ 123.

Count IX is a retaliation claim brought by Micaela Cruz (only). She alleges that she complained about the "Defendants Officers[]," and that the First Amendment protected her speech. *Id.* at ¶ 145. In response, Defendants (presumably the 2019 Defendant Officers) retaliated against her by bringing false charges against her in 2019. *Id.* at ¶ 147.

Plaintiffs also bring five state law claims, in addition to the six federal claims. Count VI is a malicious prosecution claim brought by Micaela Cruz. *Id.* at ¶¶ 131–134. Count VII is a claim for intentional infliction of emotional distress brought by all Plaintiffs. *Id.* at ¶¶ 136–138. Count VIII is a civil conspiracy claim brought by all Plaintiffs. *Id.* at ¶¶ 140–143.

Plaintiffs bring the last two claims against the City of Chicago. Count X alleges that the City is liable as principal for all torts committed by the officers, based on *respondeat superior*. *Id.* at ¶¶ 152–153. And finally, Count XI is an indemnification claim. *Id.* at ¶¶ 155–156.

Defendants moved to dismiss (or more specifically, some of the Defendants moved to dismiss, and other Defendants later joined the motion, with leave of Court). *See* Defs.' Mtn. to Dismiss (Dckt. No. 73). One of the arguments is about the complaint as a whole. Defendants

---

[1] Paragraph 108 in Count III invokes the Fourth and Fourteenth Amendments. *See* Cplt., at ¶ 108 (Dckt. No. 1). But Count II is a Fourteenth Amendment claim, and Count III is titled "Fourth Amendment Claim." So the Court reads Count III as a claim under the Fourth Amendment only. If Plaintiff intended to invoke the Fourteenth Amendment in Count III, she can file a motion for leave to amend.

argue that the complaint uses an improper "group pleading" format when bringing claims against the officers.

Defendants also challenge a number of the claims (Counts I, II, V, VI, VII, VIII, and IX) for claim-specific reasons. Defendants do not bring any claim-specific arguments against the rest of the claims (Counts III, IV, X, and XI).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When evaluating a motion to dismiss, a court begins by "taking note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Then, turning to the complaint itself, it "accept[s] the well-pleaded facts in the complaint as true," but ignores "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 680–81).

When a defendant moves to dismiss based on the notion that a plaintiff has failed to state a "plausible" claim for relief, a court asks whether the plaintiff's well-pleaded factual allegations, taken together, allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. That is, the plaintiff's allegations must tell "a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). If they don't, the complaint must be dismissed. *Iqbal*, 556 U.S. at 678.

**Discussion**

## I.     Group Pleading

Out of the gate, Defendants make an argument about the complaint as a whole.

Defendants take issue with the complaint for taking a "group pleading" approach.  *See* Defs.'

Mtn. to Dismiss, at 3 (Dckt. No. 73).  In their view, the complaint improperly lumps the parties

together *en masse*, referring to "Defendants" without revealing what each individual did wrong.

As Defendants see it, the problem is twofold.  The complaint fails to put each individual

defendant on notice about their personal involvement, leaving each person to wonder "which

claims and alleged actions they must defend themselves against."  *Id.*  The lack of specificity,

they argue, falls short of the requirements of Rule 8.  The clumping of "Defendants" also "fails

to satisfy the personal involvement requisite for § 1983 claims."  *Id.* at 6.

"There is no 'group pleading' doctrine, *per se*, that either permits or forbids allegations

against defendants collectively."  *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill.

2019).  Notice is what counts.  "'[G]roup pleading' does not violate [Rule] 8 so long as the

complaint provides sufficient detail to put the defendants on notice of the claims."  *Lattimore v.

Vill. of Streamwood*, 2018 WL 2183991, at *4 (N.D. Ill. 2018) (citation omitted).

As a matter of substance, individual liability under section 1983 requires "personal

involvement in the alleged constitutional deprivation."  *Minix v. Canarecci*, 597 F.3d 824, 833

(7th Cir. 2010) (quoting *Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003)).  To state a

claim, a complaint must contain enough facts to give rise to a plausible inference that each

defendant personally participated in the alleged wrongdoing.  *See, e.g.*, *Martinez v. Wexford

Health Servs., Inc.*, 2021 WL 1546429, at *3 (N.D. Ill. 2021) ("[T]he underlying analysis is

whether the complaint, as a whole, creates the plausible inference that each defendant is liable

8

for the act complained of."); *Moreno-Avalos v. City of Hammond*, 2017 WL 57850, at *3 (N.D.

Ind. 2017) ("Plaintiff has failed to allege facts sufficient to plausibly show that McDermott,

Dabertin, or Taylor directly participated in a violation of her constitutional rights."); *see also*

*Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("The plaintiff must demonstrate a

causal connection between (1) the sued officials and (2) the alleged misconduct.").

      The complaint at hand satisfies those standards. Plaintiffs allege that two specific groups

of officers acted together to conduct a pair of unlawful searches. They executed bogus warrants,

used excessive force, and fabricated evidence to bring false charges. The claims are about two

specific searches of a specific residence on two specific days, by two discrete groups of people.

      Plaintiffs put each of the Defendants on notice about the core of the claims, and at this

early stage, that is enough. *See Robles*, 354 F. Supp. 3d at 876 ("This complaint implicates a

single unit of less than a dozen officers who are alleged to have carried out an organized plan to

rob the defendant by committing a single constitutional violation."); *Horton v. City of Rockford*,

2019 WL 3573566, at *3 (N.D. Ill. 2019) ("[T]he Amended Complaint contains the what, where,

when, and how, but not the precise 'who' for every alleged act of misconduct. That is sufficient

at this stage. After all, a plaintiff 'may not be able to specify which individual committed which

parts of the alleged misconduct before the benefit of discovery.'") (quoting *Kuri v. City of*

*Chicago*, 2014 WL 114283, at *7 (N.D. Ill. 2014)).

      True, the complaint does not contain particulars about who, exactly, did what inside the

home. But the details can come later, after discovery. *See Horton*, 2019 WL 3573566, at *3

("Ultimately, Rule 8 is not so rigid that it requires a plaintiff, without the benefit of discovery, to

connect every single alleged instance of misconduct in the complaint to every single specific

officer.") (citation omitted).

## II.    Excessive Force (Count I)

The first claim is excessive force.  Plaintiffs allege that the 2018 Defendant Officers used excessive force by pointing guns at the children and putting the teenager (Dontay Cruz) in handcuffs.  *See* Cplt., at ¶ 95 (Dckt. No. 1).  Micaela Cruz brings a similar claim about the 2019 search because the officers pointed a gun at her, too.  *Id.*

Defendants make two arguments for dismissal.  They begin by arguing that their alleged conduct was objectively reasonable.  *See* Defs.' Mtn. to Dismiss, at 7–9 (Dckt. No. 73).  As they see it, even if everything in the complaint is true, Plaintiffs have no claim because the complaint describes conduct that passes constitutional muster.

The Fourth Amendment protects We the People from "unreasonable" searches and seizures.  *See* U.S. Const. amend. IV.  To state a claim for excessive force, a plaintiff must allege that the use of force was "objectively unreasonable."  *See Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006).  Whether force is reasonable depends on the "facts from the perspective of a reasonable officer at the time."  *Archer v. Chisholm*, 870 F.3d 603, 617 (7th Cir. 2017) (citing *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009)).  As part of that inquiry, the Court "must consider all the circumstances."  *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009).  Relevant facts include "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

"[G]un pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment."  *Baird*, 576 F.3d at 345.  Pointing a gun at someone is dangerous business, but so is being a police officer.  Part of the job involves apprehending dangerous people and

going to dangerous places, and those tasks sometimes require a show (or use) of force.  The

reasonableness of brandishing a weapon depends on the unique facts of each case, from a boots-

on-the-ground perspective.

"[W]hile police are not entitled to point their guns at citizens when there is no hint of

danger, they are allowed to do so when there *is* reason to fear danger."  *Id.* at 346 (emphasis in

original).  The police could fear danger for lots of potential reasons.  For example, a subject

might resist, or might be armed, aggressive, or erratic.  Apprehending someone for a violent

crime can create danger, too.  But there needs to be a reason for pointing a lethal weapon at

someone.  Otherwise, a person enjoys a clearly established right not to be held at gunpoint.  *Id.* at

345–46.

The age of the person on the other end of the gun is a relevant fact when assessing

reasonableness.  Cases finding constitutional violations "so often involve children because they

are much less likely to present the police with a credible threat."  *Id.* at 346.  "In other words, the

unreasonableness of the gun-pointing is more apparent in these cases, though pointing a gun at a

compliant adult in a non-threatening situation, as in this case, can also constitute excessive

force."  *Id.*

Defendants argue that pointing guns at the occupants of a home while executing a search

warrant is reasonable.  *See* Defs.' Mtn. to Dismiss, at 8 (Dckt. No. 73); *see also Simmons v. City

of Chicago*, 2017 WL 635144, at *7 (N.D. Ill. 2017); *Barron v. Sullivan*, 1997 WL 158321, at *5

(N.D. Ill. 1997).  They rely on language from *Simmons* stating that officers "are entitled to point

their guns at citizens 'when there is a reason to fear danger,' as in execution of a warrant based

on 'crimes that contain the use of force as an element, crimes involving possession of illegal

weapons, and *drug crimes*, all of which are associated with violence.'" *Simmons*, 2017 WL 635144, at *7 (quoting *Baird*, 576 F.3d at 344–46) (emphasis in original).

Maybe some cases involve complaints that plead themselves out of court, by showing that the conduct of the officers was objectively reasonable. One can imagine cases where brandishing a weapon would be necessary. Police often put themselves in harm's way, and serve the public by voluntarily going into dangerous situations. But that's not this case. Or, at the very least, that's not what this complaint says.

The complaint alleges that the officers pointed a gun at a sleeping teenager. Maybe the police felt threatened by the child when he was slumbering away, but if so, the complaint never says so. The same is true about the second search, when Micaela Cruz was home. The complaint does not say anything to suggest that the situation was dangerous, let alone establish that it was objectively reasonable as a matter of law to point a gun at her.

At the motion to dismiss stage, the complaint is what matters. And nothing in the complaint alleges that the police pursued a violent person, searched for dangerous weapons, or otherwise feared for their safety. The complaint does allege that the police executed warrants and searched for drugs. But those allegations don't get Defendants very far when the complaint also alleges that each warrant was "bogus." *See* Cplt., at ¶ 2 (Dckt. No. 1).

This case is similar to *Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000). There, as here, a plaintiff brought an excessive force claim against police officers who executed an allegedly invalid warrant. The plaintiff alleged that he was home alone, and that officers broke down his door and pointed a gun at his head for more than ten minutes while he was fully compliant. *Id.* at 764, 773.

The Seventh Circuit observed that "at the time the Defendant Officers entered Jacobs' apartment, they [did] not appear to have had probable cause to suspect Jacobs had committed any crime or to believe that any criminal activity was being conducted in Jacobs' apartment." *Id.* at 773–74. "Taking these facts as true, it appears that the Defendant Officers' use of force against Jacobs while executing an allegedly illegal search of his home and an allegedly unlawful seizure of his person was out of proportion to any danger that Jacobs could possibly have posed to the officers or any other member of the community." *Id.* at 774. The allegations about pointing a lethal weapon at a compliant person for no legitimate reason were enough to state a claim. *Id.* ("We, therefore, cannot conclude that, considering only the allegations pled in the complaint, the Defendant Officers' use of force did not violate Jacobs' Fourth Amendment rights.").

So too here. The complaint does not allege that the officers had reason to fear for their safety. If anything, the complaint does the opposite. It alleges that the police conducted an unlawful search based on false pretenses. The basis for the search, Plaintiffs allege, was completely "fabricated." *See* Cplt., at ¶ 2 (Dckt. No. 1). There was no legitimate reason to be there at all, let alone a reason to be afraid.

The complaint does not allege that the police encountered a dangerous situation when they entered the apartment, either. During the 2018 search, the officers found four children, ages 16, 12, 5, and 4. *Id.* at ¶ 16. The oldest child, Dontay Cruz, was asleep in bed and woke up to guns pointed at his head. *Id.* at ¶¶ 17–18. Children can pose a danger, but the complaint at hand doesn't give any hint that the situation was volatile. The same is true of the 2019 search, when the officers found only Micaela Cruz and her boyfriend in the apartment. *Id.* at ¶ 33.

The officers' qualified immunity argument fails for the same reasons.[2]  The facts plausibly allege that the officers violated clearly established law by using excessive force.

Once again, the facts of the complaint control.  To prevail on a motion to dismiss, Defendants would need to point to facts in the complaint that establish a qualified immunity defense as a matter of law.  *See Denwiddie v. Mueller*, 775 F. App'x 817, 818 (7th Cir. 2019) (reversing district court's grant of qualified immunity on a motion to dismiss "[b]ecause the officers did not establish that qualified immunity applies based on the facts as [plaintiff] pleaded them").  And here, there is nothing in the complaint that suggests a legitimate reason for pointing a gun at Micaela Cruz or her children.  Plaintiffs' allegations, taken as true, do not demonstrate that the officers are entitled to qualified immunity.

In the complaint, the excessive force claim also rests on the fact that the 2018 Defendant Officers put Dontay Cruz in handcuffs.  Defendants argue that it is reasonable for officers to place the occupant of a home in handcuffs when searching the premises.  *See* Defs.' Mem. in Supp. of Mtn. to Dismiss, at 8–9 (Dckt. No. 73) (citing *Muehler v. Mena*, 544 U.S. 93, 98 (2005)).

---

[2]  In their reply, Defendants argue that the Plaintiffs have waived any argument that the officers are not entitled to qualified immunity.  *See* Defs.' Reply in Supp. of Mtn. to Dismiss, at 6 (Dckt. No. 88). Though they did not mention qualified immunity specifically, Plaintiffs cited multiple cases in response to the motions to dismiss that establish that pointing guns at non-threatening occupants is unreasonable. *See* Pls.' Resp. to Mtn. to Dismiss, at 11 (Dckt. No. 87).  So, Plaintiffs haven't waived the argument.  In addition, qualified immunity is not typically granted at the motion to dismiss stage for an excessive force claim, because the analysis hinges on the specific circumstances of the encounter.  *See Hitzke v. Vill. of Mundelein*, 2021 WL 843414, at *5 (N.D. Ill. 2021) ("Whether the Officers ultimately are entitled to immunity will depend on the particular facts – facts that Plaintiff was not required to plead in her complaint to anticipate the Officers' qualified immunity defense."); *see also Tate v. City of Chicago*, 2020 WL 6715660, at *8 (N.D. Ill. 2020) ("But as Plaintiffs point out, use of handcuffs and guns . . . is analyzed for reasonableness under the circumstances.  Plaintiffs have plausibly alleged that they posed no real threat to the officers and immediately indicated their willingness to comply with the search.  Whether Defendants use of guns and handcuffs in these circumstances was reasonable is a fact intensive analysis not amenable to decision prior to discovery.  Qualified immunity is not appropriate for the same reason.").

Excessive force claims about handcuffing typically involve allegations about the *manner* of using the handcuffs. For example, a plaintiff might claim that a police officer used excessive force by locking the handcuffs too tightly, or otherwise inflicting unnecessary pain. *See, e.g.*, *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) ("A person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury."); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (collecting cases describing when the use of handcuffs constitutes excessive force, including when officers "refus[e] to loosen plaintiff's chafing handcuffs," and where tight handcuffs caused nerve damage or a "sprained wrist, shoulder, and elbow") (citations omitted); *see also Heitschmidt v. City of Houston*, 161 F.3d 834, 838–40 (5th Cir. 1998).

The complaint at hand does not allege that the officers inflicted pain when they put Dontay Cruz in handcuffs. The claim appears to be about the *fact* of using handcuffs, not the *manner* of using handcuffs. *See Norman v. City of Lake Station*, 845 F. App'x 459, 461 (7th Cir. 2021) ("Norman alleges that she was double-locked in handcuffs with her hands behind her back for 40 minutes, then again for 20 minutes. She says nothing about pain or even discomfort. Therefore, Norman failed to state a claim for excessive force.").

In the motion to dismiss, Defendants argued that they were entitled to put Dontay Cruz in handcuffs during a search of the residence. *See* Defs.' Mtn. to Dismiss, at 8–9 (Dckt. No. 73); *see also Muehler v. Mena*, 544 U.S. 93 (2005); *Michigan v. Summers*, 452 U.S. 692 (1981). Plaintiffs did not respond. *See* Pls.' Resp. to Defs.' Mtn. to Dismiss, at 10–11 (Dckt. No. 87).

In their reply, Defendants argued that Dontay Cruz waived any claim about the handcuffs by failing to respond to the motion to dismiss. *See* Defs.' Reply in Supp. of Mtn. to Dismiss, at 5 (Dckt. No. 88). Plaintiffs filed a sur-reply (with leave of Court), but once again, there was no

mention of the handcuffs.  *See* Pls.' Sur-Reply to Defs.' Reply to Mtn. to Dismiss, at 1–2 (Dckt. No. 101).

In light of the failure to respond, the Court assumes that Dontay Cruz has abandoned the claim about the use of handcuffs.  So the excessive force claim about the handcuffs is dismissed. *See Aberman v. Bd. of Educ. of City of Chicago*, 2014 WL 4912139, at *2 (N.D. Ill. 2014) ("Because Plaintiff did not address Defendants' arguments in her response to the motion to dismiss, she has waived these claims.") (citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011)).  But the Court grants leave to amend.

## III.    Due Process (Count II)

In Count II, Micaela Cruz brings a claim under the Fourteenth Amendment for wrongful detention and prosecution.  *See* Cplt., at ¶¶ 100–101 (Dckt. No. 1).  Defendants argue that such a claim is only cognizable under the Fourth Amendment, not the Fourteenth Amendment.  *See* Defs.' Mtn. to Dismiss, at 9–10 (Dckt. No. 73).

Defendants rely on the Seventh Circuit's decision in *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019).  Plaintiffs respond that "*Lewis* is no longer good law" after the Supreme Court's decision in *McDonough v. Smith*, 139 S. Ct. 2149 (2019).  *See* Pls.' Resp. to Mtn. to Dismiss, at 8 (Dckt. No. 87).[3]

*Lewis* involved two claims of unlawful pretrial detention based on the same underlying conduct.  One claim was under the Fourth Amendment, and the other was under the Fourteenth

---

[3]  This Court is duty-bound to follow precedent from the Seventh Circuit, "as a lower court cannot overrule the decision of a higher one."  *See Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1077 (7th Cir. 2004); *see also Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004); *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994); *Szany v. Garcia*, 2020 WL 2767356, at *15 (7th Cir. 2020) ("In a hierarchical system of courts, binding precedent is just that, district court judges are not free to disregard the law as clearly espoused by the Seventh Circuit, until it is either overruled by that court or the Supreme Court.").

Amendment. The Seventh Circuit held that a claim about unlawful pretrial detention arises

under the Fourth Amendment (only). "It's now clear that a § 1983 claim for unlawful pretrial

detention rests *exclusively* on the Fourth Amendment." *See Lewis*, 914 F.3d at 478 (emphasis in

original).

The Court of Appeals based its holding on the Supreme Court's decision in *Manuel v.

City of Joliet*, 137 S. Ct. 911 (2017) ("*Manuel I*"). "*Manuel I* thus clarified that the

constitutional injury arising from a wrongful pretrial detention rests on the fundamental Fourth

Amendment principle that a pretrial detention is a 'seizure' – both *before* formal legal process

and *after* – and is justified only on probable cause." *Lewis*, 914 F.3d at 476–77 (citing *Manuel I*,

137 S. Ct. at 918) (emphasis in original); *see also Manuel I*, 137 S. Ct. at 918 ("The Fourth

Amendment prohibits government officials from detaining a person in the absence of probable

cause. That can happen when the police hold someone without any reason before the formal

onset of a criminal proceeding. But it also can occur when legal process itself goes wrong –

when, for example, a judge's probable-cause determination is predicated solely on a police

officer's false statements.") (citation omitted).

Applying *Manuel I*, the Seventh Circuit ruled that a claim based on fabricated police

reports was not cognizable under the Due Process Clause. *See Lewis*, 914 F.3d at 478 ("Lewis

argues that this same misconduct by law enforcement – falsifying the police reports that led to

his pretrial detention – also violated his right to due process, giving rise to an *additional*

constitutional claim under § 1983. *Manuel I* holds otherwise as does our decision on remand in

*Manuel II*.") (emphasis in original); *see also id.* at 479 ("[I]n *Manuel II* . . . we explained that all

§ 1983 claims for wrongful pretrial detention – whether based on fabricated evidence or some

other defect – sound in the Fourth Amendment.") (citing *Manuel v. City of Joliet*, 903 F.3d 667, 669 (7th Cir. 2018)).

In the case at hand, Plaintiffs argue that the Seventh Circuit's decision in *Lewis* is "no longer sound" in light of the Supreme Court's decision in *McDonough v. Smith*, 139 S. Ct. 2149 (2019). *See* Pls.' Resp. to Mtn. to Dismiss, at 8 (Dckt. No. 87). In *McDonough*, the Supreme Court addressed when the statute of limitations begins to run for a claim that the government fabricated evidence. *See McDonough*, 139 S. Ct. at 2155 ("The question here is when the statute of limitations began to run."). As Plaintiffs read it, the Supreme Court in *McDonough* implicitly recognized a fabricated evidence claim arising under the Due Process Clause. *See* Pls.' Resp. to Mtn. to Dismiss, at 9–10 (Dckt. No. 87) ("[T]he Supreme Court necessarily accepted the premise that a Fourteenth Amendment claim exists in such a circumstance . . . .").

*McDonough* was about when a claim accrued, not whether a claim existed at all. Along the way, the Supreme Court took note of the fact that the "Second Circuit treated his claim as arising under the Due Process Clause." *McDonough*, 139 S. Ct. at 2155. But the Supreme Court did not weigh in and put its thumb on the scales. In fact, the Supreme Court called attention to the fact that it was not offering any opinion on that subject. "We assume without deciding that the Second Circuit's articulations of the right at issue and its contours are sound, having not granted certiorari to resolve those separate questions." *Id.*; *see also id.* at 2155 n.2 ("In accepting the Court of Appeals' treatment of McDonough's claim as one sounding in denial of due process, we express no view as to what other constitutional provisions (if any) might provide safeguards against the creation or use of fabricated evidence enforceable through a 42 U.S.C. § 1983 action."). It would be strange to read *McDonough* as blessing the existence of a due process

claim, after the Supreme Court said that it was not addressing the existence of a due process claim.

After *McDonough*, the Seventh Circuit had the chance to abandon its ruling in *Lewis*. But instead of overturning *Lewis*, the Court of Appeals doubled down. In *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019), the Seventh Circuit reiterated that the Fourth Amendment, not the Due Process Clause, governs a claim about an unlawful pretrial detention. "As we explained in *Manuel v. City of Joliet*, however, when a plaintiff alleges that officials held him in custody before trial without justification, '[m]alicious prosecution is the wrong characterization. *There is only a Fourth Amendment claim* – the absence of probable cause that would justify the detention.' And we recently reiterated 'that the Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention.'" *See Camm*, 937 F.3d at 1105 (emphasis added) (citing both *Manuel* and *Lewis*).

The same result applies here. Micaela Cruz invokes both the Fourth and Fourteenth Amendments, but the claim "is really one for wrongful arrest and detention in violation of the Fourth Amendment." *Id.* at 1105; *see also Henderson v. Rangel*, 2020 WL 5642943, at *3 (N.D. Ill. 2020) (rejecting the argument that *McDonough* undermines the holding in *Lewis* that a claim based on fabricated evidence "is governed exclusively by the Fourth Amendment"). The Fourteenth Amendment does not govern unlawful pretrial detention claims, so Count II is dismissed.

## IV.     Malicious Prosecution (Count VI)

Next, Defendants argue that the statute of limitations bars Micaela Cruz's claim for malicious prosecution stemming from the criminal case based on her 2018 arrest. *See* Defs.' Mtn. to Dismiss, at 10–11 (Dckt. No. 73). In response, Micaela Cruz confirms that she is not

pursuing a claim based on the 2018 criminal case and "agree[s] to the dismissal of this part of the claim." *See* Pls.' Resp. to Mtn. to Dismiss, at 14 (Dckt. No. 87). As agreed, the Court dismisses Count VI to the extent that it relies on Micaela Cruz's 2018 arrest. But the malicious prosecution claim survives to the extent that it rests on the 2019 arrest.

## V.      Intentional Infliction of Emotional Distress (Count VII)

Defendants argue that the claim of intentional infliction of emotional distress fails to satisfy the "heightened pleading requirement" under Illinois law. *See* Defs.' Mtn. to Dismiss, at 11–12 (Dckt. No. 73). But federal procedure applies in federal court, so Illinois pleading standards do not govern. *See Johnson v. Hondo, Inc.*, 125 F.3d 408, 417 (7th Cir. 1997) ("[I]t is rudimentary that pleading requirements in the federal courts are governed by the federal rules and not by the practice of the courts in the state in which the federal court happens to be sitting."). Rule 8(a) does not raise the bar and impose heightened pleading standards for a claim of intentional infliction of emotional distress.

Separately, Defendants argue that the alleged conduct is not "extreme and outrageous." *See* Defs.' Mtn. to Dismiss, at 12 (Dckt. No. 73). As they see it, "[t]he facts alleged establish that Defendant Officers . . . brandished their weapons when executing search warrants that had been approved by judges and handcuff[ed] an occupant." *Id.* "Such conduct is lawful and is routine during the execution of search warrants." *Id.*

But again, the complaint is what matters. And the complaint does not allege that the search was "lawful" at all. Instead, it does the opposite. Right off the bat, the complaint alleges that Defendants conducted an "unlawful[]" search based on "fabricated evidence" and "false[]" allegations. *See* Cplt., at ¶ 2 (Dckt. No. 1).

The complaint does allege that the search was "routine." *See* Defs.' Mtn. to Dismiss, at 12 (Dckt. No. 73). But in a bad way. *See* Cplt., at ¶ 46 ("At all times relevant to Plaintiffs' claims, the City of Chicago and the Chicago Police Department *routinely* failed to investigate cases in which Chicago Police Officers used excessive force, fabricated evidence, and/or arrested an individual without probable cause.") (emphasis added); *id.* at ¶ 68 ("At all relevant times, members of the Chicago Police Department, including the Defendants in this action, *routinely* manufactured evidence against innocent persons . . . .") (emphasis added).

Viewed as a whole, the complaint alleges that the officers knowingly executed a bogus search warrant, needlessly pointed guns at Micaela Cruz and her children, ransacked their apartment, stole property, knowingly brought false charges against Micaela Cruz, and wrongfully detained her without probable cause. *Id.* at ¶¶ 2–3, 23, 25, 27–29, 35, 37–39, 136 (Dckt. No. 1). And it happened not once, but twice. That is a far cry from the kind of conduct that Defendants call "lawful" and "routine during the execution of search warrants." *See* Defs.' Mtn. to Dismiss, at 12 (Dckt. No. 73).

Under Illinois law, those allegations are sufficient to state a claim for intentional infliction of emotional distress. *See, e.g.*, *Bianchi v. McQueen*, 2016 IL App (2d) 150646, 405 Ill. Dec. 419, 58 N.E.3d 680, 700 (2016) ("In this case, plaintiffs alleged that defendants fabricated and manufactured evidence and concealed exculpatory evidence for the purpose of falsely and maliciously detaining, arresting, and charging plaintiffs, knowing that such charges lacked probable cause. These allegations regarding defendants' abuse of power are sufficiently 'extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'") (quoting *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 180 Ill. Dec. 307, 607 N.E.2d 201, 211 (1992)).

Defendants' motion to dismiss the claim of intentional infliction of emotional distress is denied.

## VI.  Conspiracy (Counts V & VIII)

Plaintiffs also brought two conspiracy claims under federal and state law.  Defendants argue that the complaint fails to allege the existence of a conspiracy.  *See* Defs.' Mtn. to Dismiss, at 12–14 (Dckt. No. 73).  More specifically, they argue that the complaint fails to allege an agreement.  *Id.* at 14 ("Specifically, Plaintiffs do not provide any allegations regarding an alleged agreement by Defendant Officers to deprive them of their constitutional rights.").  They also argue that the allegations don't meet the "higher standard" for conspiracy claims.  *Id.* at 12 (quoting *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009)).

"There is no heightened pleading standard for conspiracy claims . . . ."  *See Sanchez v. Vill. of Wheeling*, 447 F. Supp. 3d 693, 705 (N.D. Ill. 2020); *Gibson v. City of Chicago*, 2020 WL 4349855, at *12 (N.D. Ill. 2020) (same).  But a "bare allegation of conspiracy" is "not enough to survive a motion to dismiss for failure to state a claim."  *See Cooney*, 583 F.3d at 970. "[C]ourts require the plaintiff to allege the parties, the general purpose, and the approximate date of the conspiracy."  *See Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006).

The complaint at hand clears that hurdle.  Plaintiffs bring claims against a specific group of police officers.  They allege that the officers agreed to deprive Plaintiffs of their rights and "agreed among themselves to protect one another from liability" for those deprivations.  *See* Cplt., at ¶¶ 124, 140 (Dckt. No. 1).  Plaintiffs also allege that both groups of officers "conspired to create false and fabricated police reports."  *Id.* at ¶¶ 28, 38.

The complaint alleges the purpose of the conspiracy, too.  As alleged in the indictment, Defendants Salgado and Elizondo submitted false applications for search warrants "so Defendant

Officers could seize and steal items from Chicago residents." *Id.* at ¶ 44; *see also id.* at ¶ 43 (alleging that the superseding indictment "charged conspiracy to commit theft, embezzlement, obstruction of justice, false statements to law enforcement, and conspiracy to deprive residents of Chicago of the right to be free from unreasonable searches"). It was a conspiracy to steal, by gaining the power to enter homes through false pretenses. A federal jury in the criminal case found Salgado and Elizondo guilty, so the nature of the conspiracy is not exactly mysterious. *Id.* at ¶ 5.

According to the complaint, that's exactly what the Defendants did when they entered Plaintiff's apartment. "The 2018 Defendant Officers also stole $800 from Plaintiffs' apartment which Ms. Cruz needed to pay her rent." *Id.* at ¶ 27.

The complaint alleges that the conspiracy had an additional purpose in 2019, when the second search took place. The complaint does not allege that the officers stole anything during that second search. And by 2019, Defendants Salgado and Elizondo were off the street. *Id.* at ¶ 42. But the complaint alleges that the 2019 search was an act of retaliation for Micaela Cruz's complaint about the 2018 search. She claims the 2019 Defendant Officers raided her home and falsely accused her of a crime "in retaliation for Ms. Cruz's efforts to expose Defendants Salgado and Elizondo's misdeeds." *Id.* at ¶ 41.

The complaint alleges the essentials of a conspiracy: who was involved, what they agreed to do, and when. That's enough to state a claim. The motion to dismiss the conspiracy claims is denied.[4]

---

[4] A conspiracy claim against state actors may be duplicative when a plaintiff also alleges a claim for an actual violation of his or her rights. *See, e.g.*, *Boothe v. Sherman*, 66 F. Supp. 3d 1069, 1077 (N.D. Ill. 2014) ("Defendants cannot be held liable under § 1983 for *conspiring* to violate K.C.'s due process rights unless they *actually* violated her due process rights; but if they actually violated her rights, then the conspiracy charge adds nothing to the case or to Boothe's potential recovery, as § 1983 plaintiffs may

## VII.    First Amendment Retaliation (Count IX)

Finally, Defendants argue that the complaint fails to state a claim for retaliation under the First Amendment.  *See* Defs.' Mtn. to Dismiss, at 14–15 (Dckt. No. 73).  A retaliation claim requires a plaintiff to prove that:  (1) she "engaged in activity protected by the First Amendment;" (2) she "suffered a deprivation that would likely deter First Amendment activity;" and (3) "the First Amendment activity was at least a motivating factor in the police officer's decision."  *See Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012) (citations omitted); *see also Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019).

Defendants focus on the first and third elements.  They argue that the complaint fails to allege that Micaela Cruz engaged in constitutionally protected speech, or that the speech motivated the actions against her.  *See* Defs.' Mtn. to Dismiss, at 15 (Dckt. No. 73).

"'The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.'"  *Thayer*, 705 F.3d at 251 (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  "[S]peech directed at police officers concerning their official conduct is protected under the First Amendment."  *Griggs v. City of Fort Wayne*, 2017 WL 4181142, at *13 (N.D. Ind. 2017) (citing *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987)); *see also City of Houston*, 482 U.S. at 462–63 ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").

The complaint at hand does not contain very many details about what Micaela Cruz said or did that is protected by the First Amendment.  She made unidentified "efforts to expose Defendants Salgado and Elizondo's misdeeds" and made unspecified "complaints."  *See* Cplt., at

---

recover only once for each injury.") (emphasis in original).  Still, Defendants didn't raise the issue, and Plaintiffs are free to allege multiple legal theories in their complaint.

¶ 41 (Dckt. No. 1); *see also id.* at ¶ 145 ("Plaintiff's complaints about the Defendant Officers' misconduct constituted protected speech and expression under the First Amendment. Plaintiff's complaints were also protected under the Petition Clause of the First Amendment: Plaintiff was petitioning the government for redress of grievances."). Her "efforts to expose" the misdeeds caused the 2019 search and arrest. *Id.* at ¶ 41.

Micaela Cruz does not share any details about who she complained to, or what she said. It is up in the air whether she filed written complaints, or complained orally, or expressed frustration to friends and family members, or spoke to the media, or complained through some other avenue.

But she alleges that she complained, some way somehow, about the official conduct of certain police officers. More specifically, she alleges that she complained about the "misdeeds" and "misconduct" of officers Salgado and Elizondo. *Id.* at ¶¶ 41, 145. Read in the context of the complaint as a whole, those allegations suggest that she complained about the 2018 raid of her home by those two officers (and perhaps other conduct, including conduct by other officers). The details are lacking, but the core allegation is enough to give notice and thus state a claim. *See City of Houston*, 482 U.S. at 462–63 (confirming that the First Amendment protects the right to complain about officer misconduct).

Under the third element, a plaintiff "must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman*, 547 U.S. at 259). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured – the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse

action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (citing *Hartman*, 547 U.S. at 260) (emphasis in original).

To make this showing, a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Id.* at 1724; *see also id.* at 1723 ("Thus, *Hartman* requires plaintiffs in retaliatory prosecution cases to show more than the subjective animus of an officer and a subsequent injury; plaintiffs must also prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause."). "Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution . . . ." *Hartman*, 547 U.S. at 261.

Cruz alleges that the second warrant was invalid and that the 2019 Defendant Officers fabricated evidence to arrest and charge her. *See, e.g.,* Cplt., at ¶¶ 2, 33, 95 (Dckt. No. 1) (alleging that the warrant was "bogus"). So she pled that there was no probable cause. Having pled the absence of probable cause, Cruz's claim can proceed if she alleges that the retaliation was a motivating factor for the arrest or prosecution. *See Nieves*, 139 S. Ct. at 1725.

A retaliation claim presupposes knowledge. That is, constitutionally-protected speech can motivate an unlawful arrest only if the police officers knew about the speech. *See Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct 'cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.'") (quoting *Stagman v. Ryan*, 176 F.3d 986, 1000–01 (7th Cir. 1999)) (brackets omitted). The 2019 Defendant Officers couldn't retaliate against Cruz for making a complaint without knowing that Cruz *made* complaints.

But there are no special pleading requirements for alleging knowledge. Under the Federal Rules, "knowledge . . . may be alleged generally." *See* Fed. R. Civ. P. 9(b). At this stage, Cruz does not need to provide evidence, but rather must allege enough facts to give rise to plausible inferences. *See Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) ("States of mind may be pleaded generally, but a plaintiff still must point to details sufficient to render a claim plausible.").

Cruz does not allege that the 2019 Defendant Officers knew about her "complaints." Or, at the very least, Cruz does not make that allegation with any specificity. By all appearances, Cruz does not plead specifics because she does not yet *know* any specifics. The complaint alleges, "[o]n information and belief," that the police retaliated against her. *See* Cplt., at ¶ 41 (Dckt. No. 1).

That allegation is right on the edge of the "conclusory" line. There isn't much there, apart from a bare allegation. Even so, the point of a pleading is to put defendants on notice of the claim, and the 2019 Defendant Officers have notice of the nature of the claim. So, for now, the claim survives. Without additional facts, the claim may not survive at the summary judgment stage. But that's a question for another day.

Defendants' motion to dismiss Plaintiffs' First Amendment retaliation claim is denied.

### Conclusion

Defendants' motions to dismiss are granted in part and denied in part. Count II and portions of Count I (involving the handcuffs) and Count VI (involving the 2018 arrest) are dismissed, but all other claims survive.

Date:    June 28, 2021

Steven C. Seeger
United States District Judge